IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 5, 2019 Session

## EARL GENE DAVIS v. CIVIL SERVICE COMMISSION OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 17-0510-II        William E. Young, Chancellor**

_____

### No. M2018-01130-COA-R3-CV

_____

This appeal arises from the Metropolitan Government of Nashville Civil Service Commission's decision to suspend and demote Appellant, a police officer with Metropolitan Nashville Police Department. The department's decision to suspend Appellant was affirmed by the administrative law judge, but the administrative law judge reversed the demotion. The Commission then reviewed the administrative law judge's order and upheld the suspension but reinstated the demotion. On appeal to the Davidson County Chancery Court, the Commission's decision was affirmed. Finding no error, we affirm the decision of the Chancery Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, J., joined. J. STEVEN STAFFORD, P.J., W.S., filed a separate concurring opinion.

J. Alex Little, Nashville, Tennessee, for the appellant, Earl Gene Davis.

Jon Cooper, Lora Barkenbus Fox, Nashville, Tennessee, for the appellee, Civil Service Commission of the Metropolitan Government of Nashville & Davidson County, and Metropolitan Police Department of Nashville & Davidson County.

## OPINION

### I. Background

Earl Gene Davis ("Appellant") is a Metropolitan Nashville Police Department ("MNPD") police officer. In 2010, Officer Davis was assigned to the Middle Tennessee Drug Enforcement Task Force ("Task Force"), which the United States Drug Enforcement Administration ("DEA") runs. The DEA often contracts with state and

local law enforcement agencies for cooperative enforcement concerning drug crimes. Relevant here, in the fall of 2013, the City of Nashville and the DEA formed a Program-Funded State and Local Task Force Agreement ("Task Force Agreement"). Officials from Metropolitan Government of Nashville ("Metro") and the DEA, along with the Metro Chief of Police, approved the Task Force Agreement. In relevant part, the Task Force Agreement provided:

> 2. To accomplish the objectives of the [Task Force], the MNPD agrees to detail one (1) experienced officer to the [Task Force] for a period of not less than two years. During this period of assignment, the MNPD officers will be under the direct supervision and control of DEA supervisory personnel assigned to the Task Force.
>
> 3. The MNPD officers assigned to the Task Force shall adhere to DEA policies and procedures. Failure to adhere to DEA policies and procedures shall be grounds for dismissal from the Task Force.
>
> 4. The MNPD officers assigned to the Task Force shall be deputized as Task Force Officers of DEA pursuant to 21 U.S.C. § 878.
>
> 5. To accomplish objectives of the [Task Force], DEA will assign three (3) Special Agents to the Task Force. DEA will also, subject to the availability of annually appropriated funds or any continuing resolution thereof, provide necessary funds and equipment to support the activities of DEA Special Agents and MNPD officers assigned to the Task Force. This support will include: office space, office supplies, travel funds for the purchase of evidence and information, investigative equipment, training, and other support items.
>
> 6. During the period of assignment to the [Task Force], the MNPD will be responsible for establishing the salary and benefits, including overtime, of the officers assigned to the Task Force, and for making all payments due them. DEA will, subject to availability of funds, reimburse the MNPD for overtime payments made by it to the MNPD officers assigned to the [Task Force] for overtime . . . .

While serving as a member of the "Group 1" Task Force from 2013 through 2014, Officer Davis was involved in an investigation of a drug conspiracy in Sumner County, Tennessee. DEA Special Agent Tanya Bilyeu was the lead case-agent for Group 1. Agent Bilyeu made the final operational decisions for Group 1 and also served as the supervisor when the group supervisor was out of the office. During the investigation, the Task Force discovered that F.C. was involved in a sexual relationship with his minor

step-daughter.[1]  F.C. was one of several targets in the Task Force investigation who was suspected of distributing cocaine and marijuana in Middle Tennessee.  Based on this investigation, F.C. was arrested for sexual exploitation of a minor in April 2014.  The arrest warrant for F.C. stated, in part, that he was believed to be an illegal immigrant from Mexico who posed a serious flight risk.

F.C. was scheduled for a bond hearing on July 3, 2014.[2]  F.C.'s bonding agent for this hearing was George Espinoza.  Officer Davis alleges that he believed that members of the drug conspiracy intended to bond F.C. out at a time when law enforcement was unaware so F.C. could flee to Mexico.  Officer Davis asserts that he believed Mr. Espinoza was part of the drug conspiracy and intended to accept drug funds as the source of payment for F.C.'s bond.  Allegedly fearful that F.C. would flee to Mexico, Officer Davis claims that he and Agent Bilyeu discussed several ideas about how to keep F.C. from fleeing the country.  Officer Davis contacted Immigration and Customs Enforcement ("ICE") to inquire about an immigration hold on F.C.  ICE informed Officer Davis that F.C. was a legal resident alien and that ICE would not place an immigration hold on him.  Ultimately, Officer Davis claims that he and Agent Bilyeu decided that Officer Davis should contact Mr. Espinoza, act as an ICE agent, and inform Mr. Espinoza that there was an immigration hold on F.C., such that posting bond for F.C. to make bail would be futile.  Officer Davis made the call and represented to Mr. Espinoza that his name was ICE Agent Byron Daniels, he was going to place a hold on F.C., and it would be a "pretty moot point" to bond out F.C.  Subsequently, the bond hearing was rescheduled, and F.C. remained in jail until the rescheduled bond hearing on July 7, 2014 when he was released.

On July 7, 2014, Officer Davis reported to his MNPD supervisor, Sergeant Gene Donegan, that he had been "outed" in court as a DEA agent.  Officer Davis was concerned that members of the drug conspiracy knew his real name, telephone number, and home address.  Upon hearing this information, Sergeant Donegan took immediate steps to ensure Officer Davis's safety.  In late 2014, Officer Davis was taken off the Task Force and subsequently promoted to Sergeant.

In November 2014, MNPD received a complaint from ICE regarding Officer Davis's telephone call to Mr. Espinoza.  At the same time, Officer Davis reported to Lieutenant Johnny Malzonie that he had impersonated an ICE agent without ICE's permission when he called Mr. Espinoza.  Lieutenant Malzonie contacted Captain Jason Reinbold about the incident.  Captain Reinbold immediately decommissioned Officer Davis from Sergeant to Police Officer II until an internal investigation could be

---

[1] We decline to use F.C.'s real name because we are unaware of the state of the investigation and whether F.C. was ever convicted of the crime for which he was accused.

[2] The record does not explain the reason for the delay between the date of F.C.'s arrest and the bond hearing.

- 3 -

conducted. Shortly thereafter, the MNPD Office of Professional Accountability ("OPA") launched an investigation into the matter.

Sergeant Jeremy Moseley conducted the OPA investigation. To begin his investigation, Sergeant Moseley reviewed evidence provided by Homeland Security. Following that review, Sergeant Moseley determined that he needed to proceed with the investigation. Sergeant Moseley interviewed the following people during the investigation: Mr. Espinoza; Lieutenant Malzonie; Sergeant Donegan; Lieutenant Mitch Fuhrer; Officer Davis; Agent Bilyeau; and Mike Stanfield. As a result of the investigation, on July 7, 2015, Chief Steve Anderson formally charged Officer Davis with violations of MNPD policies and procedures and with violations of the Rules of the Metropolitan Government Civil Service Commission ("the Commission"). The charging document provided, in relevant part:

**Charge 1:**

**Department Manual**
4.20 DEPORTMENT AND PERSONAL APPEARANCE
**4.20.040 Personal Behavior:** B: Adherence to Law

1. Employees are prohibited from engaging in conduct, on or off-duty, which constitutes an offense under the laws or ordinances of the United States or any subdivision thereof. (Category C)

*to wit:*

**T.C.A. § 39-16-301 – Criminal Impersonation**

**(a)** A person commits criminal impersonation who, with intent to injure or defraud another person:

**(1)** Assumes a false identity;
**(2)** Pretends to be a representative of some person or organization;
**(3)** Pretends to be an officer or employee of the government; or
**(4)** Pretends to have a disability.
**(c) (1)** Criminal impersonation under subsection (a) is a Class B misdemeanor.[3]

\*\*\*

---

[3] This is the version of Tennessee Code Annotated section 39-16-301 that was in effect at the time Officer Davis was charged with this violation.

**Charge 2**

Department Manual
4.20 DEPORTMENT AND PERSONAL APPEARANCE
**4.20.040 Personal Behavior:** K: Obstruction of Rights
Employees shall not knowingly deprive any person of any right to which they are entitled by law or the rules and regulations of the Metropolitan Government. (Category B)

***

**Charge 3**

Metropolitan Civil Service Rules
SECTION 6.7 – GROUNDS FOR DISCIPLINARY ACTION
11. Violation of any written rules, policies or procedures of the department in which the employee is employed.

***

On July 23, 2015, a MNPD advisory panel conducted a disciplinary hearing. Officer Davis was represented by counsel at the hearing and pled not guilty to all three charges. By letter of August 25, 2015, Officer Davis was informed that the panel found him guilty of all three charges. He received the following sanctions: (1) a four (4) day suspension for Charge 1; and (2) a twenty (20) day suspension and a demotion for Charge 2. He did not receive a specific sanction for Charge 3 because the violation was parallel to the departmental charges contained in Charges 1 and 2. In total, Officer Davis was suspended for twenty-four (24) days without pay and was demoted from Sergeant to Police Officer II. Officer Davis appealed this decision to the Commission.

On July 14, 2016, Administrative Law Judge ("ALJ") Leonard Pogue held a one-day hearing on this matter. Officer Davis was represented by counsel and given the opportunity to present witnesses and exhibits and to cross-examine Metro's four witnesses, namely: (1) Sergeant Donegan; (2) Captain Reinbold; (3) Sergeant Moseley; and (4) Deputy Chief Brian Johnson. Metro also introduced a set of stipulations and eleven exhibits. Officer Davis neither presented witnesses nor testified on his own behalf. On December 30, 2016, the ALJ upheld Officer Davis's suspension but reversed the demotion. The ALJ concluded that Officer Davis violated F.C.'s right to bail, but did not violate Mr. Espinoza's rights. The ALJ also found that Agent Bilyeu directed Officer Davis to make the phone call and that, because of this, "it [did] not seem unreasonable for someone in [Officer] Davis'[s] situation . . . not to immediately try to decide whether the action [was] violative of any MNPD policies." Further, the ALJ found that the Task Force Agreement did "not provide guidance for situations where the two agencies' orders

or policies may conflict." Finally, the ALJ found that there was no evidence that Officer Davis had any prior disciplinary or conduct issues that would call into question his good judgment. Therefore, the ALJ determined that the demotion was unwarranted.

On March 14, 2017, the Commission reviewed Judge Pogue's order and heard argument of counsel. By order of March 22, 2017, the Commission reinstated Officer Davis's initial discipline of a twenty-four (24) day suspension and a demotion finding that it was both reasonable and warranted based on the facts of the case. The Commission also adopted Metro's proposed findings of facts and conclusions of law.

Officer Davis timely appealed the Commission's order to the Chancery Court of Davidson County ("trial court"). By order of May 17, 2018, the trial court found substantial and material evidence to uphold the Commission's decision to affirm Officer Davis's suspension and reinstate his demotion to Officer II. Officer Davis appeals.

## II. Issues

On appeal, Officer Davis ostensibly raises several issues. However, we conclude that he is merely raising different arguments in support of one issue. The dispositive issue is whether the trial court erred when it affirmed the Commission's: (1) ruling that Officer Davis violated MNPD Policy § 4.20.040(B) and MNPD Policy § 4.20.040(K);[4] and (2) decision to suspend and demote him.

## III. Standard of Review

Judicial review of the Commission's decision is governed by the Uniform Administrative Procedures Act ("UAPA"). Tenn. Code Ann. § 27-9-114(b)(1); *City of Memphis v. Civil Serv. Comm'n of Memphis*, 238 S.W.3d 238, 242 (Tenn. Ct. App. 2007). The UAPA provides, in pertinent part:

(a)(1) A person who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter, which shall be the only available method of judicial review. . . .

\*\*\*

(h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative

---

[4] We note that Officer Davis does not address on appeal the Commission's ruling that he violated Metropolitan Civil Service Rule 6.7(11), presumably because the violation paralleled the MNPD Policy § 4.20.040(B) and (K) violations.

findings, inferences, conclusions, or decisions are:

> (1) In violation of the of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
>
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
>
>> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.
>
> (i) No agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision.

Tenn. Code Ann. § 4-5-322. This Court explained the standard set forth in Tennessee Code Annotated section 4-5-322 in *City of Memphis*, to-wit:

> Upon confirming that an agency has employed the proper legal principles in the case under review, this Court must then consider the disputed factual findings and address whether the agency had a reasonably sound basis for making those findings. *See McEwen v. Tenn. Dept. of Safety*, 173 S.W.3d 815, 820 (Tenn. Ct. App. 2005). Like the trial court, this Court applies the substantial and material evidence standard in reviewing the agency's findings of fact. *Bobbitt v. Shell*, 115 S.W.3d 506, 509-10 (Tenn. Ct. App. 2003). Substantial and material evidence is "such relevant evidence as a reasonable mind might accept to support a rational conclusion" and to furnish a reasonably sound basis for the decision under consideration. *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. 2007) (quoting *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 110-11 (Tenn. Ct. App. 1993)); *Dickson v. City of Memphis Civil Serv. Comm'n*, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005); *Pruitt v. City of Memphis*, No. W2004-01771-COA-R3-CV, 2005

- 7 -

WL 2043542, at *7 (Tenn. Ct. App. Aug. 24, 2005); *Bobbitt*, 115 S.W.3d at 510.

As directed by the statute, we take into account whatever in the record fairly detracts from the weight of the evidence, but we may not substitute our own judgment on questions of fact by re-weighing the evidence. *See* Tenn. Code Ann. § 4-5-322(h)(5)(B). When the agency conducts a hearing and can evaluate the witnesses as they testify, this Court gives the tribunal's credibility determinations great weight. *Pruitt*, 2005 WL 2043542, at *7. Moreover, the substantial and material evidence standard does not justify reversal of an administrative decision only because the evidence could also support another result. *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001). Rather, we may reject an administrative determination only if a reasonable person would necessarily arrive at a different conclusion based on the evidence. *Id.*

Likewise, Tennessee Code Annotated Section 4-5-322(h)(4) permits a reviewing court to modify or reverse an administrative decision if it is "[a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tenn. Code Ann. § 4-5-322(h)(4). A decision unsupported by substantial and material evidence is arbitrary and capricious. *City of Memphis*, 216 S.W.3d at 315. Yet, a clear error of judgment can also render a decision arbitrary and capricious notwithstanding adequate evidentiary support. *Id.* at 316. A decision is arbitrary or capricious if it "is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* (quoting *Jackson Mobilphone*, 876 S.W.2d at 110-11).

*City of Memphis*, 238 S.W.3d at 243.

## IV. Analysis

Officer Davis argues that the Commission's conclusion that he violated MNPD Policy § 4.20.040(B) and MNPD Policy § 4.20.040(K) is arbitrary, capricious, and unsupported by material evidence because: (1) Officer Davis did not violate MNPD policy; (2) assuming, *arguendo*, that he violated MNPD policy, it was at the direction of his DEA supervisor; and (3) the discipline imposed by the Commission is grossly excessive compared to the alleged MNPD policy violations. We will address each of Officer Davis's arguments in turn. However, we note at the outset that, although he was given the opportunity, Officer Davis chose not to testify before the ALJ hearing. When asked at oral argument before this Court if there is anything in the record for this Court to

review that would provide Officer Davis's substantive statements, Officer Davis's counsel indicated that there was a lengthy substantive statement from Officer Davis that was taken in the course of the OPA investigation, which should be in the record before this Court. In reviewing the record before the ALJ, it appears that counsel may have been referring to Exhibit 7, a recording of Sergeant Moseley's interview with Officer Davis in the course of the OPA investigation. Exhibit 7 was marked for identification purposes only and was never admitted into evidence at the ALJ hearing. Therefore, we do not have this recording in our record. Another document in the ALJ record that could match counsel's statements is Exhibit 11, the letter from Chief Anderson to Officer Davis detailing the findings of the investigation and the charges against Officer Davis. However, when Metro attempted to admit this exhibit into evidence, Officer Davis objected to its introduction for substantive purposes. The objection was sustained by the ALJ, and the document was admitted into evidence purely for procedural purposes. Specifically, Metro stipulated that it was not introducing the document for the truth of the matters asserted in the document. Therefore, this Court cannot consider Officer Davis's statements in Exhibit 11. Finally, the only other document that was in the record before the ALJ that also contains Officer Davis's substantive statements is Exhibit 5, an email attachment from Officer Davis to Sergeant Donegan, in which Officer Davis partially described the incidents on July 3, 2014 and July 7, 2014. Consequently, the only real substantive evidence in the record of Officer Davis's account comes from the testimony of MNPD officers at the ALJ hearing. We now turn to address Officer Davis's specific arguments.

## A. Violation of MNPD Policies.

### 1. MNPD Policy § 4.20.040(B): Adherence to Law

As discussed above, MNPD Policy § 4.20.040(B) provides:

**4.20.040 Personal Behavior:** B: Adherence to Law

1. Employees are prohibited from engaging in conduct, on or off-duty, which constitutes an offense under the laws or ordinances of the United States or any subdivision thereof. (Category C)

*to wit:*

**T.C.A. § 39-16-301 – Criminal Impersonation**

**(a)** A person commits criminal impersonation who, with intent to injure or defraud another person:

**(1)** Assumes a false identity;

**(2)** Pretends to be a representative of some person or organization;

**(3)** Pretends to be an officer or employee of the government; or

**(4)** Pretends to have a disability.

**(c) (1)** Criminal impersonation under subsection (a) is a Class B misdemeanor.[5]

With regard to MNPD Policy § 4.20.040(B), the Commission concluded, in pertinent part:

> 7. [Officer] Davis placed the phone call to Mr. Espinoza on July 3, 2014. The recording of the phone call . . . reveals [Officer] Davis claiming to be an ICE agent and lying about placing an immigration hold on Mr. Cas[as].
>
> 8. This is clearly a violation of MNPD's Rules and Regulations. [Officer] Davis impersonated a different law enforcement agent for the purpose of defrauding Mr. Cas[a]s and Mr. Espinoza, which is conduct[] prohibited by T.C.A. § 39-16-301.

Officer Davis argues that the Commission's conclusion that he violated MNPD Policy § 4.20.040(B) is a clear error of law because he was immune from criminal liability under the "public authority defense." The trial court concluded that although Officer Davis may have been immune from *criminal liability* under the "public authority defense" it did not follow that Officer Davis was immune from punishment under MNPD Policy § 4.20.040(B).[6] As the trial court identified, MNPD's policy prohibits employees "from engaging in conduct . . . which constitutes an offense under the laws . . . of the United States or any subdivision thereof." Therefore, simply engaging in the prohibited conduct, regardless of whether the person is charged with or convicted of violating the underlying statute, is a violation of MNPD Policy § 4.20.040(B). Officer Davis stipulated to the fact that he called Mr. Espinoza and identified himself as an ICE agent. He also stipulated to the audio recording of the telephone call between Mr. Espinoza and Officer Davis wherein Officer Davis represented to Mr. Espinoza that he was an ICE agent, who was about to place an immigration hold on F.C. Officer Davis was never an ICE agent, so, by impersonating one, he clearly intended to "defraud" Mr. Espinoza. Tracking the language of Tennessee Code Annotated section 39-16-301(a), *supra*, Officer Davis "assume[d] a false identity" or "pretend[ed] to be a representative of" ICE with the "intent to injure or defraud" Mr. Espinoza. Tenn. Code Ann. § 39-16-301(a). There is no indication in MNPD Policy § 4.20.040(B), *supra*, that the person must be criminally liable for violation of Tennessee Code Annotated section 39-16-301, only that he or she

---

[5] This is the version of Tennessee Code Annotated section 39-16-301 that was in effect at the time Officer Davis was charged with this violation.

[6] We reach no conclusion regarding Officer Davis's actual immunity under the "public authority defense."

- 10 -

engages in conduct "which constitutes an offense under the laws or ordinances of the United States or any subdivision thereof." Therefore, we agree with the trial court that there is substantial and material evidence to support the Commission's decision that Officer Davis did just that, i.e. engaged in conduct which constituted an offense under Tennessee law and therefore violated MNPD Policy § 4.20.040(B).

Nonetheless, Officer Davis argues that MNPD officers "regularly deceive individuals in the course of investigations" without fear of criminal investigation because they are acting "under the color of law," i.e., on the basis of public authority. He argues that he was acting under the "color of law" when he made the ruse call to Mr. Espinoza. As the trial court recognized, there is a distinction between an officer acting "under the color of law" and Officer Davis's actions. At the ALJ hearing, Sergeant Donegan, Officer Davis's MNPD supervisor while Officer Davis was on the Task Force, testified that the "color of law" exception applies when an officer lies to a "suspect" during the course of an undercover investigation:

**Q.** With regard to the criminal impersonation, what does "under the color of law" mean when you said that earlier?

**A.** Basically, you're allowed to violate it while in the -- while in execution of your job and your duties, basically. You know, it's kind of like going ten mile an hour over the speed limit if you're running in emergency traffic. That's under – you're allowed to do that.

Same way with, you know, impersonating a person. If you're talking to a suspect and in order to do -- during an undercover operation while you're talking to that suspect, you're obviously authorized to use false statements.

\*\*\*

**Q.** So, typically, with an undercover investigation, who is the officer deceiving?

**A.** The suspect.

**Q.** Is the officer deceiving court officials?

**A.** No.

**Q.** Are they deceiving people making representations to Court?

**A.** No.

- 11 -

Similar testimony was elicited from Brian Johnson, Deputy Chief of Police over the Field Operations Bureau:

> **Q.** So, specifically with regard to the criminal impersonation charge, why did you feel like that charge was merited?
>
> **A.** My belief was based upon the fact that it is common knowledge that police officers can lie in the course of an investigation. It's known that officers working in undercover capacities have alternate IDs issued to them by the State of Tennessee, and those are used for a number of different reasons. One, if an officer is conducting a drug deal and tells the person that he's trying to buy the drugs from that his name is Tom, and the guy says, well, then prove it, let me see your license. Well, if he pulls out a license that says Steve, then, obviously, that would be problematic. So they use those identities for that. . . .
>
> So in this case . . . it was looked at that [Officer Davis] didn't lie to [F.C.] about [] ICE. He lied to the bondsman. The bondsman was essentially a neutral third party. He was not related to the charges. He had not been charged himself with anything. He was not a defendant in any of the case. He's just simply a business owner that was trying to make his bond and was impacted as a result of that lie.

We agree with the trial court that Officer Davis was not acting "under the color of law," as that term is defined in the record, when he called Mr. Espinoza and impersonated an ICE agent, which is not the same as giving a fictitious name. Therefore, Officer Davis is not immune from departmental discipline for his actions. Thus, the Commission's conclusion that Officer Davis violated MNPD Policy § 4.20.040(B) was not arbitrary or capricious and it was supported by substantial and material evidence in the record.

### 2. MNPD Policy § 4.20.040(K): Obstruction of Rights

Officer Davis was also found to have violated MNPD Policy § 4.20.040(K), which provides:

> **4.20.040 Personal Behavior:** K: Obstruction of Rights
>
> Employees shall not knowingly deprive any person of any right to which they are entitled by law or the rules and regulations of the Metropolitan Government. (Category B)

With regard to MNPD Policy § 4.20.040(K), the Commission concluded, in pertinent part that

- 12 -

. . . [Officer] Davis set out to keep [F.C.] in jail longer than the normal court proceedings would have allowed and accomplished that goal. This violated [F.C.]'s right to bail and Mr. Espinoza's right to conduct lawful business without improper interference from the police.

Officer Davis argues that the Commission's conclusion that he deprived F.C. of his right to bail, and deprived Mr. Espinoza of his right to earn a living as a bondsman, is arbitrary, capricious, as it was unsupported by substantial and material evidence.

In Tennessee, defendants in non-capital cases have a right to reasonable bail. TENN. CONST. art. I, § 15; Tenn. Code Ann. § 40-11-102. Officer Davis argues that he did not deprive F.C. of his right to bail for two reasons. First, he asserts that the telephone call did not deprive F.C. of his right to bail. Essentially, Officer Davis argues that Mr. Espinoza could have attempted to bond out F.C. despite Mr. Espinoza believing that ICE would place a hold on F.C. In his appellate brief, Officer Davis argues that "[t]he weight of the MNPD's argument . . . rests on whether 'in essence' the ruse call to Mr. Espinoza revoked the defendant's ability to make bond." Officer Davis uses this quote from Sergeant Moseley's testimony at the ALJ hearing to support his argument:

According to TCA, an individual is allowed to make bail and have the ability to get out, unless it's a capital offense or something that is deemed by the courts that they're not allowed to. In this particular manner, [F.C.] was a bailable defendant based upon the nature of the charge in which he was charged. But by making the phone call, in essence, Sergeant Davis revoked his ability to make bond on that given day because no bondsman is going to continue to try to make a bond if they know ICE is going to put a hold on their client. That means they'll lose whatever money they've put up.

As Sergeant Moseley testified, the telephone call had the effect of preventing F.C. from making bail, which was Officer Davis's entire intention in placing the call. Indeed, after Officer Davis called Mr. Espinoza, the July 3, 2014 bond hearing was rescheduled to July 7, 2014. Nonetheless, Officer Davis argues that his actions did not deprive F.C. of his ability to make bond in spite of the fact that that was exactly Officer Davis's intention. Despite arguing that the telephone call did not prevent F.C. from being bonded out by Mr. Espinoza, Officer Davis concedes in his appellate brief: "Although it is reasonable to conclude that the call stopped F.C. from making bail *by using Mr. Espinoza as a bondsman* on July 3, the MNPD did not suggest . . . that a detained criminal defendant has a right to use a *particular* bonding company to pay his or her bond." (Emphasis in original). Officer Davis proceeds to argue that he was not only concerned with F.C.'s criminal activity but Mr. Espinoza's as well. He claims that he and the DEA were concerned that Mr. Espinoza was part of the drug conspiracy and that Mr. Espinoza was

going to use drug money to bond out F.C. There was no evidence introduced at the ALJ hearing to support these statements. Conversely, Sergeant Moseley testified that Mr. Espinoza was neither charged with a crime nor identified as part of the drug conspiracy. Further, Officer Davis did not introduce any evidence to refute Sergeant Moseley's testimony. Officer Davis argues that "[t]hese motivations are important because the MNPD did not introduce any evidence to suggest that Mr. Davis would have blocked F.C. from obtaining bail through legitimate means or by using a legitimate bonding company not associated with the criminal conspiracy under investigation." This argument completely contradicts Officer Davis's previous argument that he needed to keep F.C. in jail because he was concerned F.C. would flee to Mexico. Further, MNPD was not required to introduce any evidence to demonstrate that Officer Davis's actions would have blocked F.C. from obtaining bond by using a different bondsman because that was irrelevant to the facts of this case.

Second, Officer Davis argues that F.C. waived his right to release on bond because "the dates in the record demonstrate that he did." As support for this position, Officer Davis cites the ALJ hearing transcript, wherein Officer Davis's counsel cross-examined Sergeant Moseley and counsel stated that, while F.C. was arrested on April 5, 2014, the bond hearing did not proceed until July 2014. Officer Davis provides no law to support his argument that F.C. waived his right to bond because the bond hearing did not proceed until three months later. Therefore, this argument is without merit.

Officer Davis also argues that his telephone call was "analogous to when detectives mislead a defendant in custody about the weight of the evidence . . . or a similar fact in hopes that he waives his *Miranda* rights and chooses to confess." We do not see the analogy to the circumstances before us. Further, Officer Davis does not provide authority for such position or cite any case where facts analogous to the instant case supported such conclusion. Here, Officer Davis did not mislead the defendant, F.C.; as discussed, *supra*, he misled the bondsman, Mr. Espinoza. Therefore, this analogy and argument is misplaced.

Rather, we agree with the trial court's conclusion that

[Officer] Davis admitted he made a ruse phone call to Mr. Espinoza, posing as an ICE officer, in order to prevent [F.C.] from being released from jail. His ploy was successful and [F.C.] remained in jail for an additional four days. [Officer] Davis may not now argue that his actions were of no consequence in bringing about his desired result – keeping [F.C.] in jail.

The evidence in the record demonstrates that Officer Davis's ruse telephone call to Mr. Espinoza effectively prevented F.C. from being bonded out on the initial bond hearing date. It was also Officer Davis's intention to deprive F.C. of his right to bail. This was the sole purpose of the ruse.

- 14 -

Officer Davis also argues that he did not deprive Mr. Espinoza of his right to do business.  While the ALJ concluded that MNPD "[did] not prove[] what right to which Mr. Espinoza [wa]s 'entitled by law' that was violated," the Commission concluded that Officer Davis violated "Mr. Espinoza's right to conduct lawful business without improper interference from the police."  At the ALJ hearing, Chief Johnson testified that

> [a]s far as Mr. Espinoza goes, again, it goes back to the fact that Mr. Espinoza is a licensed and bonded businessman in the State of Tennessee.  At the time this was occurring, there had been no charges brought against him, he was doing business as a licensed person in the state of Tennessee, legitimate business owner, nothing that showed us that he wasn't legitimate, and yet the result of the phone call influenced him to not make this bond, which caused him not to make money that day.

We conclude that there is substantial and material evidence in the record to support the Commission's conclusion that Officer Davis knowingly deprived Mr. Espinoza of his right to conduct lawful business without improper interference from the police.  There is also substantial and material evidence in the record that demonstrates that Officer Davis's telephone call to Mr. Espinoza caused Mr. Espinoza to not bond out F.C., resulting in a loss of business to Mr. Espinoza.  Accordingly, we affirm the trial court's ruling that the Commission's conclusion that Officer Davis violated MNPD Policy § 4.20.040(K) was not arbitrary or capricious and was supported by substantial and material evidence.

## B.  MNPD Policy v. Actions While Working Under DEA Task Force

Officer Davis argues that, assuming *arguendo* that he violated MNPD policies, pursuant to the Task Force Agreement, he was under the "direct supervision and control of" the DEA and its supervisors.  As such, any actions he took during this time were at the direction of his DEA supervisors.  Therefore, when he called Mr. Espinoza, he did so at the direction of his DEA supervisor and should not be punished for obeying the commands of his DEA supervisor.  While it is unclear from the record whether Officer Davis made the telephone call at the direction of his DEA supervisor, resolution of that question is not dispositive of our analysis.

The ALJ, the Commission, and the trial court all concluded that Officer Davis was still subject to the rules and regulations of MNPD while he was on the Task Force.  Although the Task Force Agreement stated that Officer Davis would be under the supervision and control of the DEA, nothing in the Task Force Agreement exempted Officer Davis from continued compliance with MNPD rules and regulations.  Indeed, Officer Davis stipulated that he remained an MNPD police officer while he was on the Task Force.  Further, testimony from Deputy Chief Johnson demonstrated that, even though he was operating under the Task Force Agreement, Officer Davis knew he was

still subject to MNPD's rules and regulations:

> Well, in the hearing, you know, I asked Mr. Davis at one point with regard to the [Task Force Agreement], I asked him if he traveled outside the Davidson county limits, what would he do, and he admitted that he knew, per our policy, that he had to notify his supervisor. So, to me, that's an indication that he's still bound by the rules of the Metropolitan Police Department and not simply by the rules of the DEA.

Indeed, MNPD officers testified at the ALJ hearing that, even when an officer is assigned to a task force, he or she is still a MNPD officer and is still subject to MNPD rules and regulations. Sergeant Moseley testified that he believed that Officer Davis understood that he still had to comply with MNPD rules while on the task force, to-wit:

> **Q.** D[id] Officer Davis still have to comply with the rules when he's assigned to the task force?
>
> **A.** Yes, he did.
>
> **Q.** Based on what?
>
> **A.** He's still a Metro Nashville Police Department employee. Based on my conversation with him, he indicated up front that he understood that, yes, I'm a Metro police officer, yes, the policies and provisions apply to me, but he also said he was held to the DEA as well. So he understood he had two sets of policy. But even with that, he doesn't give -- there is nothing that takes it to where ours don't apply to him. Even during the course of the interview when speaking with supervisors, they agreed that he understood because he came in and signed for orders and stuff that he knew was departmental regulations. And I even had some individuals reach out to past task force officers, point blank, did you know that you were still a Metro officer having to obey Metro policies. And the ones that were reached out to said, yeah, we knew that.

While there was no language in the Task Force Agreement or in MNPD's rules and regulations concerning resolution of conflicts between a command from a Task Force supervisor and a conflict with MNPD rules, several MNPD officers testified, at the ALJ hearing, that they would have called their MNPD supervisor if there was a possible conflict to get instructions before moving forward under the direction of the Task Force supervisor. These officers opined that Officer Davis should have followed this procedure. Officer Davis presented no evidence to rebut this testimony. Accordingly, we agree with the trial court's conclusion that "Officer Davis's status as a Task Force Officer [did] not shield him from charges that he violated MNPD policy." From our review, the

record contains substantial and material evidence to support the Commission's decision that Officer Davis could be held responsible for violating MNPD policy while serving on the Task Force.

## C. Discipline Imposed

Finally, Officer Davis argues that MNPD failed to follow its policies by not mitigating Officer Davis's punishment. Officer Davis asserts that because he followed the orders of his DEA direct supervisor and because he made the telephone call "without any improper motives," the punishment is excessive. According to the record, Officer Davis was demoted from sergeant because sergeants must be trusted to make appropriate judgment calls. Sergeant Donegan testified that sergeants often have to exercise judgment when advising the police officers he supervises. Exhibit 2 from the ALJ hearing is the job description of a Police Sergeant with Metro. Some of the "major job responsibilities" include: (1) counsels with and corrects officers as needed; (2) resolves conflicts between officers and the public; (3) interprets legal issues for officers; (4) investigates officers' actions or activities; (5) analyzes policy or procedure violations; (6) investigates complaints made concerning officers; and (7) explains policies, procedures, or laws to officers or the public. Captain Reinbold testified regarding why he immediately decommissioned Officer Davis when he learned that Officer Davis impersonated an ICE agent after being informed that ICE would not place an immigration hold on F.C.:

> **A.** . . . [A]dditionally concerning was the fact that he was in a supervisory role, and I could not afford somebody that is making decisions that are so negatively impacting to continue those in that capacity where it could impact the officers he is supervising.
>
> **Q.** So expand on that for me, if you would. What negative decisions are you talking about? What specifically was wrong with his actions on that?
>
> **A.** Well, the lack of communication on making that decision to act as an ICE agent and with – without the permission of ICE to act as an agent was ultimately concerning. And with the -- in addition to it, the results of that decision, knowing that the intent was to retain him unlawful - to retain the defendant unlawfully in jail was very concerning.

Sergeant Donegan also testified regarding the decision-making skills a sergeant must exhibit:

> **Q.** Are there any limits in your mind on what is done in the course of your investigation?

**A.** Sure. I mean, that's -- as a supervisor, that's one of the things I think of all the time. At what point in time -- at what point in time can we call it off, basically.

Finally, Deputy Chief Johnson testified that he recommended the demotion because he

> . . . felt very strongly, and the panel did as well, that . . . the role of a [S]ergeant in the police department, it's a very vital role. They're the first-line supervisor to all the officers on the street. Officers call the [S]ergeants and ask advice. They ask, can we do this, should we do this, how do we do this . . . those type of things.
>
> So the role is vitally important that the people in the role of a [S]ergeant understand the law, understand the rules, and understand how to properly apply those rules. In fact, it's in the [S]ergeant job description -- there is some terminology to that effect -- that a [S]ergeant is expected to know the laws and the rules better than an officer and is expected to give guidance in that.

The evidence demonstrates that Officer Davis was demoted from sergeant because his superiors could no longer trust his decision-making capabilities or his ability to properly advise the officers under his supervision. Based on substantial and material evidence in the record, and in view of the "job responsibilities" of a MNPD sergeant, we agree with the trial court that the Commission's decision to adopt MNPD's initial discipline of demotion and to uphold Officer Davis's suspension was neither arbitrary nor capricious.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against Appellant, Earl Gene Davis, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE